Kathy MCABEE, Appellant

v.

Darren C. CHAPMAN, M.D., Appellee

2014–SC–000555–DG

Supreme Court of Kentucky.

DECEMBER 15, 2016

COUNSEL FOR APPELLANT: Charles S. Wible, Charles S. Wible Law Offices, PSC

COUNSEL FOR APPELLEE: Charles G. Franklin, Franklin, Gordon & Hobgood

OPINION OF THE COURT BY JUSTICE HUGHES

Kentucky Rule of Evidence (KRE) 615 permits a party in any proceeding to which that rule applies to demand that persons who will testify during the proceeding be excluded from the courtroom "so that they cannot hear the testimony of other witnesses." The Rule is subject to certain exceptions, including an exception for "a person whose presence is shown by a party to be essential to the presentation of the party's case."[1] We granted discretionary review in this medical malpractice matter to consider whether the trial court properly applied the "essential person" exception when it excepted from the Plaintiff's invocation of "the rule," (as KRE 615 is commonly known in Kentucky courts) two of the defendant's expert witnesses. We conclude that the trial court misapplied the rule because it did not require the defendant to make an adequate showing that the presence in court of either expert was

---

1. In its entirety, KRE 615 provides as follows: "At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order on its own motion. This rule does not authorize exclusion of: (1) A party who is a natural person; (2) An officer or employee of a party which is not a natural person designated as its representative by its attorney; or (3) A person whose presence is shown by a party to be essential to the presentation of the party's cause."

"essential" to the presentation of the defendant's case, but we further conclude upon careful review of the record that the error was harmless. We thus affirm, *albeit* for different reasons, the Court of Appeals' affirmance of the trial court's Judgment.

## RELEVANT FACTS

In April 2011, Kathy McAbee, a resident of Dawson Springs, Kentucky, brought suit in the Hopkins Circuit Court against Darren Chapman, MD, a general surgeon who practices primarily in Madisonville, Kentucky. Ms. McAbee alleged that Dr. Chapman injured her and caused her financial loss and pain and suffering by negligently performing a surgical procedure known as an anastomosis, a procedure whereby separate sections of tube-like structures—in this case Ms. McAbee's colon—are joined together. Because resolution of this case requires an understanding of the medical proof, we review that proof in considerable detail.

Beginning in about September 2009, Ms. McAbee, then sixty-five, experienced periodic bouts of abdominal pain and digestive problems which her primary care physician referred to as an "irritable bowel" condition. These episodes gradually became more frequent and more intense, until in January 2010, a particularly severe episode prompted Ms. McAbee to seek emergency room treatment at what was then known as the Madisonville Regional Medical Center. Diagnostic procedures performed there, including a CT scan, indicated a stricture, a partial closure, in Ms. McAbee's sigmoid colon, the final, s-shaped curve of the colon just before the beginning of the rectum. Dr. Chapman was called in to consult with Ms. McAbee and her two daughters, and he explained to them that in his view Ms. McAbee's condition was quite serious and urgent, malignancy being a possible cause of the stricture and perforation of the colon being a possible result, since the occlusion was already far along.

On January 14, 2010, Dr. Chapman performed surgery on Ms. McAbee. He removed the constricted portion of the colon (diverticulitis, an inflammatory condition, not malignancy, the apparent cause), and because Ms. McAbee's condition had not allowed for an adequate bowel preparation, rather than reattaching the colon to the rectum, (what is referred to as an "anastomosis") he set up a colostomy[2] on Ms. McAbee's abdomen and sealed off the rectum below the excision. This procedure allows the colon a chance to recover before making the reconnection.

Dr. Chapman performed the reconnection, or anastomosis—referred to by the parties and in the record as the colostomy "take down" four months later—on May 14, 2010. While an anastomosis used to be routinely, and is still sometimes, established by means of sutures—stitches sewn in by the surgeon—Dr. Chapman employed a newer surgical instrument, a sort of stapler that is referred to as such in the record. This stapling instrument brings together the two parts of the tract to be connected by means of an anvil and a base. The anvil is anchored to the tissue on one side of the desired connection, and the sides are brought together when the anvil is screwed onto a central post projected from the base which has been anchored to the tissue on the other side. The tract can be connected end-to-end, like two sections of a garden hose; end-to-wall, like a T-joint between drain pipes; or even wall-to-wall. Once the two sides have been brought together, the instrument connects them by forcibly inserting a double ring of staples—with a selected diameter—thus

---

**2.** A colostomy is an artificial connection between the colon and the skin.

effecting a seam around the inside of the tract. In the process a doughnut-shaped circle of tissue inside the ring of staples is cut away, thereby opening the tract. It is Dr. Chapman's performance of this stapling anastomosis procedure that Ms. McAbee alleges fell below the standard of care.

On May 26, 2010, not quite two weeks after the take-down procedure, Ms. McAbee returned to the emergency room because she noticed feces in her urine. She was referred to an urologist, Dr. James Fellows, who, on about June 1, 2010, performed a cystoscopy, i.e., he inserted a viewing instrument, a cystoscope, inside Ms. McAbee's bladder and examined the bladder wall. The examination revealed a fingertip-sized hole, or fistula, through the wall of the bladder, through the conjoined wall of the rectum,[3] into the rectum itself. The fistula allowed feces to pass from rectum to bladder and urine to pass from bladder to rectum. To her immense distress, physical and psychological, in the days that followed Ms. McAbee experienced both.

During that initial exam, Dr. Fellows also found in the fistulous tract three staples such as those employed in the anastomosis, all of them closed into figure eights. According to Dr. Fellows, the staples were not connected to any tissue, but appeared merely to have floated along the fistulous tract and were lying loosely on the wall of the bladder. He picked them up with a "grabber," an extension of the cystoscope, and removed them.

Drs. Fellows and Chapman conferred, and they agreed that Ms. McAbee would require several weeks, even months, of recovery before she could possibly tolerate a corrective surgery. In the meantime, on June 3, 2010 Dr. Chapman set up a second colostomy, this one at a different, and according to Ms. McAbee a far less convenient, place on Ms. McAbee's abdomen. The second colostomy, according to Dr. Chapman, was intended not only to alleviate the problem of colon contents passing into the bladder, but was also meant to move the colon as far from the fistula as possible. This colostomy did prevent the movement of material from colon to bladder, but it did not prevent the movement in the opposite direction of urine into the rectum, a problem that plagued Ms. McAbee for the next several months.

Making attempts to address that problem, Dr. Fellows on three occasions, on about June 19, 2010, July 13, 2010, and July 27, 2010, cauterized near the fistula the tissue that had formed connecting the bladder and the rectum, in hopes that separated from the rectum the bladder might spontaneously heal the hole that had formed in it.[4] During the first of those procedures, Dr. Fellows found two more staples scattered along the fistulous tract and removed them with the "grabber."

By the end of July, it was apparent that the conservative approach, cautery, had failed to induce Ms. McAbee's bladder to heal itself, and Ms. McAbee testified that at that point she felt abandoned by both Dr. Chapman and Dr. Fellows. Both were suggesting, she claimed, that she resign herself to her condition, including wearing a colostomy, for the rest of her life.

Drs. Chapman and Fellows denied abandoning her or making that suggestion, but in any event, Ms. McAbee sought a second

---

**3.** There was medical testimony to the effect that a sort of connective tissue often forms between abdominal organs in regular contact.

**4.** Several of the doctors noted during their testimony that in women the uterus normally separates the bladder from the rectum, but because Ms. McAbee had had a hysterectomy, that was not the case with her.

opinion. In August 2010 she met with surgeons at the University of Vanderbilt Medical Center. Dr. Melissa Kaufman, an urologist specializing in reconstructive surgery, and Dr. Alan Herline, a colorectal surgeon, jointly examined her at that time and worked out a team approach to her surgery, an approach that would allow them to address both the bladder and the rectal aspects of the fistula in the course of a single anesthesia.

They performed that joint surgery in November 2010. Dr. Herline completely separated the bladder from the rectum; Dr. Kaufman, who had discovered a second hole in Ms. McAbee's bladder, then resected the two holes and repaired them; and finally Dr. Herline, it appears, took down Dr. Chapman's June 3rd colostomy, removed injured portions of both rectum and colon, and was able with what remained to reconnect those segments of the bowel.

Following that extensive surgery, Ms. McAbee was much improved, in that her appearance and her functioning were returned to more like normal, but she remained subject to frequent urinations and bladder spasms, and her much truncated rectum could no longer absorb water sufficiently to prevent frequent bouts of diarrhea. Those continuing problems and the "time outs" they necessitated, made it impossible, Ms. McAbee testified, to perform her job as a hairdresser, so that the damages she alleged included not only medical expenses and pain and suffering, but also lost earnings.

Ms. McAbee's theory of the case was based to a large extent on the expert testimony and opinion of Dr. Ira Kodner, a former surgeon and colorectal specialist on the faculty of Washington University in St. Louis. He testified that in May 2010, when Dr. Chapman took down the first colosto-

my from January of that year and used the stapling instrument to make the anastomosis, he mistakenly put the anastomosis lower on the rectum than he intended, so low as to impinge on the bladder, which he had not completely dissected from the rectum, and in so doing made holes in the bladder and rectum that became the fistula. That fistula was later the object of Dr. Fellows's unsuccessful cautery treatments and then the joint corrective surgery in Nashville by Drs. Kaufman and Herline. Dr. Kodner testified that this theory was consistent with (1) Ms. McAbee's finding feces in her urine within a couple of weeks of the May take-down procedure, (2) Dr. Herline's surgical report, which Dr. Kodner understood to describe Dr. Herline's anastomosis being placed higher on the rectum than Dr. Chapman's, and (3) the staples Dr. Fellows found along the fistulous tract.

Dr. Kodner's opinion was seconded to some extent by Dr. Kaufman, the Vanderbilt urologist, who testified (by way of video deposition played for the jury) that it was reasonable to suppose that the staples Dr. Fellows found and removed were from Dr. Chapman's May 2010 anastomosis and that she herself had never seen a case in which loose staples had "floated" into a fistula from someplace else. She readily conceded during questioning by defense counsel, however, that she had not been present during Dr. Fellows's examination and that her own examination of Ms. McAbee had revealed neither staples nor staple marks on Ms. McAbee's bladder.

The theory of the case advanced by Dr. Chapman was based primarily on Dr. Chapman's description of the May 2010 take-down/anastomosis procedure and testimony by two defense experts—Dr. William Gerald Cheadle,[5] and Dr. Edward

---

**5.** At the time of trial, Dr. Cheadle was a practicing general surgeon, as well as, among

other positions, a professor of surgery and director of the general surgery residency de-

Shuttle worth.[6] The defense was to the effect that Dr. Chapman's decisions and performance were reasonable in the circumstances, competent and within the standard of care. According to Dr. Chapman, he placed the anastomosis high on the rectum, as he intended, well away from the bladder, tested it appropriately for leaks, and finding none, completed the surgery. Unfortunately, later-developing, small leaks are a recognized complication of anastomoses, and such a leak apparently developed in this case. In the defense view, the proximity of Ms. McAbee's bladder to her rectum allowed the caustic bowel seepage to come into contact with the bladder, and after several days—nearly two weeks—that seepage eroded a hole in the bladder and created the fistula. The fistula, in other words, and its unfortunate consequences for Ms. McAbee, were a known inherent medical risk, not the result of surgical negligence.

Consistent with this theory, Dr. Chapman and his experts claimed, were the facts that the nurse anesthetist attending Dr. Chapman's May 2010 take-down procedure at no point noticed blood in the Foley catheter (inserted into Ms. McAbee's bladder at the outset of the procedure), and during the leak test at the end of the procedure noticed no air in the catheter. Had the bladder been injured during the anastomosis, these doctors testified, it would have bled, and the blood would have appeared in the catheter. Likewise, according to the defense, when Dr. Chapman tested the anastomosis by inflating with air

a portion of the bowel including the new connection, had the bladder been cut open during the procedure and connected to the rectum, the air would have passed through the opening, through the bladder, and into the catheter, and again the nurse anesthetist would have recognized this.

Also significant for these doctors was the fact that Ms. McAbee did not complain about fecal material in her urine for nearly two weeks following the procedure—a time frame consistent with the fistula-by-erosion theory that these doctors testified to, but not consistent with Dr. Kodner's fistula-by-stapler theory. Under the latter, according to the defense, feces would have appeared in the urine sooner, in no more than a few days, as indeed Dr. Kodner himself originally testified during his deposition. Finally, these doctors read Dr. Herline's surgical report differently than did Dr. Kodner. They understood Dr. Herline to say, as one would ordinarily expect, that his anastomosis, which followed additional resection, was lower on the rectum (nearer the anus) than was Dr. Chapman's.[7]

The jury returned a nine-to-three defense verdict and the Court of Appeals affirmed in an opinion discussed in detail *infra.* Ms. McAbee contends that the fairness of her trial was compromised when the trial court mistakenly denied Ms. McAbee's request to subject the parties' expert witnesses to the ordinary separation of witnesses rule.[8] The trial court's error, Ms. McAbee contends, enabled one of the defense experts, Dr. Shuttleworth, to be

partment at the University of Louisville School of Medicine.

**6.** At the time of trial, Dr. Shuttleworth had recently retired following a thirty-year career as a general surgeon in Muhlenberg County.

**7.** Dr. Herline's report is in the record but, for reasons unknown, he never testified in this case.

**8.** To be clear, all expert witnesses, both plaintiff's and defendant's, were allowed to be in the courtroom prior to their testimony. The alleged error on appeal focuses solely on a single defense expert, Dr. Shuttleworth.

present in the courtroom during Dr. Kodner's testimony on the second day of trial, and then, in the course of his testimony during the trial's fourth day, to comment directly on what Dr. Kodner had said. In Ms. McAbee's view, this practice usurped the jury's role as weigher of the evidence.

Our analysis of Ms. McAbee's claim has necessitated this somewhat lengthy summary of the parties' dispute, since we must address not only whether the trial court abused its discretion—and we agree with Ms. McAbee that it did—but also whether that error is apt to have been a substantial factor in the jury's resolution of the case. Having reviewed the trial in detail, we are confident in saying that it was not. In our view, there was error but it was harmless, and there is no ground for retrial.

## ANALYSIS

### I. The Trial Court Abused Its Discretion By Exempting The Defense's Expert Witnesses From Sequestration Without An Adequate Showing of Need.

As noted above, upon a party's invocation of "the rule," *i.e.*, upon the party's request for separation of witnesses, KRE 615 requires the trial court to exclude trial witnesses, so that they cannot hear the testimony of other witnesses. Most jurisdictions have similar, if not identical, rules, the purposes of which are to discourage and expose "fabrication, inaccuracy, and collusion." Robert Lawson, THE KENTUCKY EVIDENCE LAW HANDBOOK § 11.40[1][b], p. 878 (5th ed. 2013) (quoting the advisory note to the nearly identical federal rule). *Hatfield v. Commonwealth, 250* S.W.3d 590, 594 (Ky. 2008) ("The thrust of KRE 615 is to ensure that witnesses do not alter their own testimony based on what they hear from other witnesses."). The efficacy of the practice is widely recognized even outside the courtroom, by police officers,

for example, who routinely separate crime- or accident-scene witnesses before interviewing them, and it has been recognized, as many courts have noted, since at least biblical times. *See, e.g., Opus 3 Ltd. v. Heritage Park, Inc.*, 91 F.3d 625, 628 (4th Cir. 1996) (noting the account in the *Apocrypha*, w. 36–64, of Daniel's vindication of Susanna of adultery by sequestering her accusers, whose inconsistent testimonies about where her alleged adulterous act took place made clear the falsity of their accusations). Indeed, separation of witnesses "is (next to cross-examination) one of the greatest engines that the skill of man has ever invented for the detection of liars in a court of justice." *Id.*, citing 6 John H. Wigmore, WIGMORE ON EVIDENCE § 1838 at 463 (James H. Chadbourn ed. 1976).

As we noted in *Hatfield*, 250 S.W.3d at 593–94, the mandatory nature of our current rule was clarified in January 2005 when preexisting versions in the Kentucky civil and criminal rules, versions leaving the sequestration of witnesses largely to the trial court's discretion, were rescinded, and KRE 615 was established as the controlling rule in our courts. Because, under the current rule, a court may decline a party's request to sequester a particular witness only if one of the rule's three express exemptions applies, the rule creates a strong presumption in favor of sequestration. *Cf. United States v. Jackson*, 60 F.3d 128, 135 (2nd Cir. 1995) (discussing the nearly identical federal rule). Moreover, the party opposing the presumption bears the burden of showing that one of the exemptions applies. *Hatfield*, 250 S.W.3d at 595 (holding that a trial court errs by exempting a witness from sequestration absent the requisite showing); *Opus 3 Ltd.*, 91 F.3d at 628 (noting that "the party seeking to avoid sequestra-

tion of a witness bears the burden of proving that a Rule 615 exemption applies").

■ In this case, it was actually defense counsel who first invoked the rule. He did so, according to the parties, during an off-the-record conference in the trial court's chambers prior to the commencement of the trial's second day. Following jury selection and opening statements, the trial's first day had ended with the conclusion of Ms. McAbee's direct examination—she was the first witness in the case—and the second day was to begin with defense counsel's cross-examination of her. Having noted, apparently, that some of the plaintiff's other witnesses, including Ms. McAbee's daughter and some of Ms. McAbee's friends, had been in the courtroom during Ms. McAbee's direct examination, defense counsel moved, prior to his cross-examination, that lay witnesses be sequestered. He qualified his motion, however, by asking that sequestration not apply to the witnesses the parties had designated as experts.

Plaintiff's counsel, it appears, initially agreed to this expert-witness exemption from the rule, but a short time later, when, back on the record, the trial court called the attorneys to the bench to confirm the agreement, plaintiff's counsel stated that, on second thought, he "would prefer just an across-the-board exclusion of witnesses." Defense counsel objected and asserted that plaintiff's concurrence was not necessary because the separation-of-witnesses rule "only involves lay witnesses; it doesn't include experts." The court, clearly reluctant to keep the jury waiting and having been assured by the parties that no expert witness would testify before lunch, deferred ruling until the lunch recess, when it would have an opportunity to check the law.

During the lunch recess there was, it appears, more off-the-record discussion of the question, but when the record resumed following the recess, the court explained that in its view KRE 615(3), the "essential witness" exception to the general rule of sequestration, allows expert witnesses to be excepted, "provided that the party asking that they not be excluded, ... offers an explanation to show that they are essential to the presentation of their case." The court then turned to defense counsel and asked if she could "offer such an explanation ... on the record." Defense counsel's reply, in its entirety, was, "Yes sir, these experts will not be testifying as to the facts of the case, and they are essential to the management of the case."

Objecting, plaintiff's counsel disagreed that the expert testimony, which would include the experts' interpretations of highly technical medical records, could accurately be characterized as not testifying to the facts. The trial court acknowledged the plaintiff's concern, but explained that allowing the experts from both sides to listen to and comment upon the opposing side's inevitably conflicting expert testimony "would be helpful to the fact finder." It therefore denied the plaintiff's invocation of the witness-separation rule, and ruled that the designated experts would be "allow[ed] to remain in the courtroom."

Not surprisingly, the sort of expert point-and-counterpoint the trial court seems to have envisioned did not take place. Ms. McAbee's expert, Dr. Kodner, who lived and worked in St. Louis, testified soon after the trial court's ruling during the afternoon of the trial's second day. Dr. Chapman's first expert, Dr. Cheadle (from Louisville), testified during the third day of trial. And Dr. Shuttleworth, Dr. Chapman's second expert, testified at the end of the defense case during day four. Only Dr. Shuttleworth (who was retired and lived in Muhlenberg County) appears to have been in court during the other

experts' testimonies, and he was the only expert to comment about an opposing expert's trial testimony. Thus, the alleged error on appeal is confined to Dr. Shuttleworth's presence in the courtroom and ensuing testimony.

As Ms. McAbee notes, during his direct examination of Dr. Shuttleworth, defense counsel several times referred to Dr. Kodner's prior testimony and asked Dr. Shuttleworth whether he agreed with the opinions Dr. Kodner expressed. These opinions were to the effect that the initial surgery in January 2010 was not as urgent as Dr. Chapman supposed; that a milder, slower bowel preparation at that time could have made the initial colostomy unnecessary; that the fistula-by-stapler theory accorded better with the other evidence than the fistula-by-erosion theory; and that Dr. Herline's report indicated that his November 2010 anastomosis was higher on the rectum than Dr. Chapman's anastomosis of May 2010. Dr. Shuttleworth disagreed with all of these opinions; explained the basis of his disagreement; and, though he refrained (following an objection by plaintiff's counsel) from stating that he thought Dr. Kodner's interpretation of Dr. Herline's report was "mistaken," testified that in his view what Dr. Kodner said the Herline report said and what the report actually said were not the same.

On appeal to the Court of Appeals, Ms. McAbee alleged that the trial court abused its discretion under KRE 615 by inappropriately applying the "essential witness" exception of that rule's subpart (3) and allowing the expert witnesses to remain in the courtroom during other witnesses' testimonies. The Court of Appeals' panel unanimously disagreed. It acknowledged that in *Hatfield* this Court emphasized that the "essential witness" exception required a "showing" that the witness's presence in the courtroom during the testimony of other witnesses was in fact "es-

sential" to the proponent's presentation of his or her case. Relying on *United States v. Phibbs*, 999 F.2d 1053, 1073 (6th Cir. 1993), however, which notes (quoting the Advisory Committee's commentary) that the parallel federal rule "contemplates such persons as .... an expert needed to advise counsel in the management of litigation," the panel concluded that Dr. Chapman made the requisite "showing," merely by pointing out that he sought to exempt "opinion" experts, not "fact" witnesses, and by asserting, without elaboration, that the exemption was "essential to the management" of his case. In the appellate panel's view, the technical nature of the evidence made the input of experts "essential," and, because the panel deemed opinion testimony to be less prone to "falsity, inaccuracy, and collusion" than factual testimony, it had little concern that the opinion experts here would influence each other regarding the facts. Satisfied, therefore, that in this opinion-expert context the trial court had not abused its discretion by exempting the experts from sequestration, and noting as a sort of after thought that even had there been an abuse of discretion Ms. McAbee had failed to explain how it had prejudiced her, the Court of Appeals affirmed the trial court's judgment.

Within just a few months of the Court of Appeals' Opinion, this Court rendered its Opinion in *Spears v. Commonwealth*, 448 S.W.3d 781 (Ky. 2014), a criminal case in which we unanimously upheld a trial court's refusal to exempt from sequestration under subsection (3) of KRE 615 a defense forensic expert whose assistance defense counsel sought during the testimony of the prosecution's forensic experts. We rejected Spears's contention that KRE 615 applies, or should be deemed to apply, only to "ordinary" witnesses, not to experts, who Spears asserted, "should be allowed, or even encouraged, to hear and

comment upon the testimony of other witnesses, especially the opposing experts." 448 S.W.3d at 789. KRE 615 has never been so understood, we noted.[9] Spear's suggestion that trial courts would do well to try to frame expert testimony as a debate, point and counterpoint, between the experts, was not an improvement over "the time-honored tradition" of each expert setting forth his or her opinion, subject to cross-examination by opposing counsel, with the jury then determining the more credible view. *Spears*, 448 S.W.3d at 789.

In accord with *Hatfield*, we held in *Spears* that the "essential witness" exemption under KRE 615(3) should be limited to those witnesses, lay or expert, the party seeking the exemption can "show" to be not merely helpful, but "essential" to the presentation of its case. *Id.* Because Spears's "vague and general" assertion that his expert " 'was well prepared, and could have helped the defense immeasurably by listening to the testimony of the Commonwealth's experts and lending a helping hand on cross examination,' " failed to specify how the expert's absence would unduly burden either the presentation of the defendant's case or the refutation of the Commonwealth's theory, the trial court did not abuse its discretion by refusing to exempt the defense expert. 448 S.W.3d at 788–89.

■ That result is consistent with decisions by other courts construing similar rules. *E.g., State v. Traversie*, 387 N.W.2d 2 (S.D. 1986) (holding that the trial court did not abuse its discretion by sequestering a criminal defendant's fingerprint expert). Although it appears that no court has developed a precise test for what makes a witness's presence "essential," the proponent of the exception must do more than show that the witness's presence is "simply desirable," *Opus 3, Ltd.*, 91 F.3d at 629 (citation and internal quotation marks omitted), or "helpful." *United States v. Agnes*, 753 F.2d 293, 307 (3rd Cir. 1985), *abrogated on other grounds by Smith v. Borough of Wilkinsburg*, 147 F.3d 272 (3rd Cir. 1998); *Olofson*, 563 F.3d at 661. Nor is it enough to show that the witness's testimony is apt to be important. The question, rather, is "whether the witness is needed in the courtroom when that witness is not testifying." Victor James Gold, 29 *Fed. Prac. & Proc. Evid.* § 6245 (2d ed. April 2016 Update).

Admittedly, in a given case, the need may be counsel's. For example, witnesses have been properly exempted from sequestration because their familiarity with lengthy or complex factual situations made them essential advisors to counsel. *United States ex rel. Bahrani v. Conagra, Inc.*, 624 F.3d 1275 (10th Cir. 2010); *Meece v. Commonwealth*, 348 S.W.3d 627 (Ky. 2011). We can imagine expert-witness

9. The predecessors to KRE 615—old Kentucky Rule of Criminal Procedure (RCr) 9.48 and Kentucky Rule of Civil Procedure (CR) 43.09—both applied expressly to "*any* witness of the adverse party" (emphasis supplied). And the federal courts, even those embracing the idea that opinion experts do not implicate the separation-of-witnesses rule's purposes as compellingly as do fact witnesses, have nevertheless uniformly rejected any *per se* exemption of experts from the federal counterpart of KRE 615. *See, e.g., Morvant v. Construction Aggregates Corporation*, 570 F.2d 626, 630 (6th Cir. 1978) ("[H]ad the framers [of the rule] intended it [an automatic exemption for experts], they would have said so, or added a fourth exception."); *United States v. Seschillie*, 310 F.3d 1208, 1213 (9th Cir. 2002) ("We decline to conclude, however, that an expert witness will *always* meet the criteria of Rule 615(3)."); *United States v. Olofson*, 563 F.3d 652, 660–61 (7th Cir. 2009) ("Rule 703 [the federal counterpart of KRE 703] is not an automatic exemption for expert witnesses from Rule 615 sequestration.").

cases in which a similar exemption might well be appropriate. Just as there are cases, such as *Conagra* and *Meese*, so factually complex that a witness familiar with the facts can appropriately be deemed "essential" as an advisor to counsel, so might there be cases involving such highly technical fields of expertise that an expert witness could reasonably be deemed "essential" to assist counsel with those technicalities. This case is not, however, and it is not claimed to be, unusually complex.

■ The need may also be the witness's, a witness, for example, whose own testimony will be based on the testimony of others. *United States v. Lussier*, 929 F.2d 25 (1st Cir. 1991) (finding no abuse of discretion where the trial court did not sequester the IRS agent who testified as to the amount of tax due as a summation of testimony by other witnesses). An expert witness, of course, may base his or her opinions on "facts or data . . . made known to the expert at . . . the hearing." KRE 703(a). If an opinion expert's only way to learn the facts material to his or her opinion is to hear the trial testimony of other witnesses, then a trial court abuses its discretion by sequestering that expert. *Malek v. Federal Ins. Co.*, 994 F.2d 49 (2nd Cir. 1993) (holding that fire expert should not have been sequestered where opposing expert testified to facts and theories not revealed prior to trial); *Seschillie*, 310 F.3d at 1208 (holding that expert on the accidental discharge of firearms had sufficient need to hear testimony of alleged shooting victims to require an "essential witness" exemption).

Of course, expert opinions may be based on stipulated or undisputed facts, or may address only questions of principle or theory without reference to particular facts at all. In such cases, there would seem to be no need whatsoever for the expert to be present for the testimony of other witnesses. Even experts offering opinions based on the facts of the particular case will usually have access to those facts—via depositions, documents (such as medical records), or hypothetical questions—without being present for the testimony of other witnesses. If for some reason those alternatives would be inadequate in a given case, an "essential witness" exemption may be appropriate. *United States v. Forehand*, 943 F.Supp.2d 1329 (M.D. Ala. 2013) (exempting expert witness where the need for opinions regarding a large number of differently situated victims made the hypothetical-question approach unwieldy and unsuitable).

In this more typical case, however, discovery was extensive, and both sides were well aware of the facts, both undisputed and disputed.[10] Medical records, stipulations, and hypothetical questions could have provided an entirely adequate factual context for the experts' testimony even had the experts been sequestered. The exemption here was sought, not because there was a compelling reason *for* an exception to the rule, but rather, as Dr. Chapman candidly argues, because an exception could be useful—better for the experts to hear the witnesses directly than to have that testimony presented to them indirectly by counsel—and, arguably, there was no compelling reason *not* to seek an exemption. After all, " 'opinion' testimony is required in most medical malpractice cases and is necessarily based on 'facts' as testified to by the parties and other witnesses with firsthand knowledge, as well

---

10. All of the expert witnesses, plaintiff's and defendant's, were deposed and there is no suggestion that any expert's testimony at trial differed from his deposition testimony in any significant way, nor is there any suggestion that any fact witness deviated from the "known" facts in any significant way.

as review of medical records." Appellee's Brief at p. 9. Why not just say that expert witnesses are thus "essential to the management of medical malpractice trials" and allow them as a matter of course in such trials "to observe the testimony of other witnesses"? *Id.*[11]

The Court of Appeals agreed. As it noted, opinion experts frequently do not have first-hand knowledge of the facts and so must, in some fashion, "hear" the testimonies of other witnesses. With respect to such expert witnesses, therefore, the primary dangers KRE 615 seeks to guard against are, to some extent, attenuated, and the safeguards the rule provides are, to some extent, made pointless. Those facts have led some courts to a broad interpretation of the "essential witness" exception with respect to opinion experts and, correspondingly, to require a lesser showing of need to justify such a witness's exemption. *Morvant*, 570 F.2d at 626; *Malek*, 994 F.2d at 49; *Seschillie*, 310 F.3d at 1208.

The obvious problem with this view is that it amounts, or can easily amount, to a thinly veiled rewriting of the rule, in effect adding an exception for opinion experts that the rule itself does not provide. As noted above, the courts adopting this view have been careful to disavow that purpose and to insist that opinion experts remain subject to the rule's essentiality requirement. Nevertheless, those courts hold that the requirement should be very flexible in the case of an opinion expert.

■ This case does not require us to weigh in on that question, however, because even if some lesser showing of need could suffice to establish that an opinion expert was an "essential witness" for the purposes of KRE 615(3), the rule would still require *some* showing that the witness's presence during the testimony of other witnesses would be not merely helpful or innocuous, but in some meaningful sense "essential." Here, Dr. Chapman provided no showing at all. Parroting the rule, one of the defense counsel asserted that the defense experts were "essential," but she provided no basis whatsoever for that assertion.[12] In essence, Dr. Chapman as-

---

11. Although Dr. Chapman's "showing" before the trial court incanted the "essential to the management of the case" provision of KRE 615(3), he expressly denies that he had any need of an "elbow expert" to assist counsel with cross-examination or with any other aspect of case management. He points out that neither defense expert sat at counsel table. He argues that in this way this case is distinguishable from *Spears*, where, as noted above, the claim for a KRE 615(3) exception was based in part on the putatively "essential" expert's ability to "lend a hand" with cross-examination. Further attempting to distance this case from *Spears*, Dr. Chapman also downplays, by making no reference to it, the trial court's suggestion that exempting the experts in this case would be a good idea as it would enable them to hear and to respond to one another's testimony, a sort of give-and-take the trial court thought would be helpful to the jury. *Spears*, as noted, expressly rejected the idea of expert give-and-take as justify-

ing a KRE 615(3) exemption. At first blush, the idea could be thought to have some abstract, superficial appeal, but, as this case tends to illustrate, even assuming that expert debate could be illuminating for a jury (a dubious assumption), bringing it about in the context of a trial is apt to be so fraught with practical pitfalls and difficulties as to more than offset any supposed advantages. Finally, Dr. Chapman notes that *Spears* was a criminal case, and suggests, therefore, that its application of KRE 615(3) to expert witnesses should be limited to the criminal context. We are not persuaded that any of these differences amounts to a meaningful distinction. We note in particular that KRE 615 replaced separate civil and criminal separation-of-witness rules, the intent pretty clearly being for the one rule to apply in both contexts.

12. To the extent that Dr. Chapman suggests that he satisfied the rule's proof requirement during off-the-record discussions in the trial

serted a *per se* exemption for opinion experts, but, as noted above, that assertion has been universally rejected, and in accord with *Hatfield*,[13] was expressly rejected by this Court in *Spears*. The trial court abused its discretion and the Court of Appeals erred, therefore, by holding that Dr. Chapman adequately invoked the KRE 615(3) essential witness exception.[14]

## II. The Trial Court's Abuse Of Discretion Was Harmless.

■ To say that the trial court abused its discretion by failing to sequester the expert witnesses when Ms. McAbee asked it to do so does not end the matter, however. This Court has recognized that "failure to separate witnesses may be harmless error under the particular circumstances of the case." *Hatfield*, 250 S.W.3d at 595. In *Justice v. Commonwealth*, 987 S.W.2d 306 (Ky. 1998), for example, a DUI vehicular assault case, we agreed with the defendant that the trial court abused its discretion when it exempted from KRE 615 the victim of the auto accident. We noted, however, that the separation-of-witnesses rule "was adopted to prevent witnesses who have not yet testified from altering their

testimony in light of evidence adduced at trial." 987 S.W.2d at 315. Because "[a]ppellant offer[ed] nothing to show that Lockhart's [the victim's] testimony was false, fabricated, or factually inaccurate or that Lockhart had a motive to alter his testimony," and further because "Lockhart's testimony was consistent with the testimony of a rebuttal witness who was subject to separation," *id.* we held that the trial court's error had not prejudiced the appellant and was harmless.

Similarly, in *Hatfield*, an attempted-murder prosecution, we held that the trial court erred by exempting from separation without an adequate showing of need under KRE 615(3), the victim's grandfather. Nevertheless, because the grandfather's testimony was largely cumulative and not crucial to the Commonwealth's case, we held that the opportunity the trial court's error gave him "to tailor his testimony to correlate with prior witnesses," was in the particular circumstances "inconsequential." His testimony, we concluded, was unlikely to have "undermined the integrity of the fact finding process," and the trial court's error was therefore harmless. 250 S.W.3d

---

court's chambers, we pause only to note the obvious: the rule's requirement of a "showing" means, of course, that the party seeking the exemption must place *on the record* satisfactory grounds for granting it.

13. *Hatfield* involved a fact witness who had been exempted from sequestration under KRE 615(3) without any showing of essentiality. Granting that trial courts have broad discretion under that rule to allow exemptions, we held that nevertheless a trial court abused its discretion when it exempted the witness without any showing of need at all.

14. Dr. Chapman asserts that we ought not apply *Spears*, which was rendered in December 2014, retroactively to this case, which was tried in August 2013. He correctly notes that there are limitations on the retroactive application of judicial decisions that create "new

rules." *Leonard v. Commonwealth*, 279 S.W.3d 151 (Ky. 2009). Even assuming, however, that the Court's rejection in *Spears* of a *per se* exemption for opinion experts from sequestration under KRE 615 amounted to a "new" rule and not one dictated by *Hatfield*—see *Leonard,* 279 S.W.3d at 161 for a discussion of when a case may be deemed to have announced a new rule for retroactivity purposes—application of a new civil rule is appropriate, generally, to cases, such as this one, still pending on direct appeal at the time the new rule is announced and in which the issue addressed by the new rule was preserved. *Bums v. Level*, 957 S.W.2d 218 (Ky. 1997); *Maney v. Mary Chiles Hospital*, 785 S.W.2d 480 (Ky. 1990); *Hilen v. Hays*, 673 S.W.2d 713 (Ky. 1984). So even if *Spears* announced a new rule (and it did not), we would not be barred from retroactively applying that rule to this case.

at 596 (citations and internal quotation marks omitted).

On the other hand, in *Mills v. Commonwealth*, 95 S.W.3d 838 (Ky. 2003), a case that involved the robbery of a filling station attendant, the trial court's refusal to sequester the victim/attendant was an abuse of discretion, we held, since the victim did not come within any of the KRE 615 exceptions. The error could not be deemed harmless, furthermore, because the victim was the Commonwealth's key identification witness and there was a very real chance that his opportunity to hear testimony by the investigating officer detailing the victim's original police statement and specifying the defendant's height and weight as revealed on his driver's license refreshed the victim's recollection and enabled him to tailor his own testimony accordingly, thus allowing him to seem a more credible witness than he might have otherwise been.

While these cases all involve the trial court's improper failure to sequester a fact witness, they indicate that important factors in the harmless error analysis are the relative importance of the non-sequestered witness's testimony and the likely effect on that testimony of the prior testimony by others. That effect may be difficult to gauge in fact-witness cases, since it "may be impossible to tell how a witness' testimony would have differed had the defendant's motion to exclude been granted." *Seschillie*, 310 F.3d at 1216 (citation and internal quotation marks omitted). *Mills* appears to be an example of just such a case.

■ In expert-witness cases, however, the situation is somewhat different. Even had the expert been sequestered, in accordance with the separation-of-witnesses rule, he or she, when testifying, could and would have been made aware of other witnesses' testimony, at least to the extent that testimony reflected pertinent facts and opinions. Asking an expert witness about facts testified to by the parties or opinions rendered by opposing experts is simply standard procedure. In such cases, therefore, the harmless error analysis is not simply whether the erroneously non-sequestered expert's testimony was affected in any way by the testimony of others— it clearly will have been—but rather whether it was *improperly* affected.

Under our rules, of course, we are to disregard trial errors and defects that "do[ ] not affect the substantial rights of the parties." RCr 9.24. With respect to non-constitutional errors, such as the one here, we have interpreted this rule to mean that an error is harmless "if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth*, 283 S.W.3d 678, 689 (Ky. 2009) (citing *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). Convinced, as explained below, that the trial court's failure to sequester the experts in this case did not substantially sway the outcome, we deem the error harmless and not a ground for appellate relief.

Ms. McAbee contends in her reply brief that the testimony during the trial's fourth day by the defense's second expert, Dr. Shuttleworth, was improperly affected by Dr. Shuttleworth's having heard the testimony of the plaintiff's expert, Dr. Kodner, on the second day of trial. This testimony included Dr. Kodner's interpretation of the surgical report prepared by the Vanderbilt colorectal surgeon, Dr. Herline. Dr. Shuttleworth testified that he had heard Dr. Kodner's interpretation and that he had read Dr. Herline's surgical report, and in his view the report did not say what Dr. Kodner said it did.

Ms. McAbee maintains that while Dr. Shuttleworth was free to testify as to his opinion about the report, and while defense counsel was free to argue during closing about whose opinion was correct and why, it was improper for Dr. Shuttleworth to be asked "to comment on the testimony of another witness." According to Ms. McAbee, the question was improper for a couple of reasons. She likens it, first, to one witness being asked (usually during cross-examination) whether another witness has lied, a practice this Court condemned in *Moss v. Commonwealth*, 949 S.W.2d 579 (Ky. 1997), as an invasion of the jury's prerogative to assess witness credibility. Since Dr. Shuttleworth was not asked whether, and neither said nor suggested that, Dr. Kodner's reading of Dr. Herline's report was dishonest as opposed to incorrect, we decline Ms. McAbee's invitation to extend *Moss* to circumstances so unlike those involved in that case. In particular we reject, under these facts at least, Ms. McAbee's suggestion that one expert witness's testimony to the effect that another expert witness's testimony was mistaken impinges, somehow, on the jury's prerogative to weigh the evidence. Disagreeing experts are central to many, if not most, disputes that are tried in a court of law. Those experts must be allowed to articulate their opinions and grounds of disagreement without accusations they are treading on the jury's role as factfinder.

Ms. McAbee also maintains that Dr. Shuttleworth's being asked to comment on Dr. Kodner's testimony smacks of the "debate" approach to expert testimony, an approach the trial court embraced in this case, but which we rejected in *Spears*. However, in *Spears* we rejected not so much opposing experts expressing disagreement with each other (again, they regularly do), but rather the notion that, contrary to KRE 615 and the traditional trial practice of direct and cross-examina-tion, all the experts should be present for each other's testimony so that disagreements might be answered, back and forth, as though the trial *were* an actual debate. Here, to be sure, Dr. Shuttleworth was able to couch his disagreement with Dr. Kodner in terms of what he heard Dr. Kodner say in the courtroom, whereas had he been sequestered there would necessarily have been some sort of hypothetical or reference to Dr. Kodner's testimony used to elicit his grounds for disagreement. At least in the context of this case, however, we are firmly convinced that the jury's impression was not significantly affected by that difference.

Our conviction arises from the emphasis defense counsel placed throughout trial on the five critical points to which, he told the jury during opening statement, the case could be boiled down: (1) Was the need for the original colectomy urgent enough to proceed without a thorough bowel preparation, even though lack of that preparation would necessitate a colostomy? Dr. Chapman and his experts testified yes; Dr. Kodner testified that a slower approach was possible and was also preferable in that an adequate bowel preparation would have obviated the colostomy and thus avoided the problems that ensued.

(2) When Dr. Chapman took down the colostomy, did he misplace the anastomosis so as to staple the bladder and thus cause the bladder/rectum fistula? Dr. Chapman and his experts testified no; the anastomosis was placed high on the rectum and well away from the bladder. In their view, the fistula developed because after a few days the anastomosis unfortunately broke down and seeped caustic bowel contents onto the bladder. Dr. Kodner testified that the anastomosis was placed too low and that staples punctured the bladder. Dr. Herline's report was relevant to this point, because according to Dr. Kodner's reading

of that report, Dr. Herline's ultimate anastomosis was higher on the rectum than Dr. Chapman's had been, thus suggesting that Dr. Chapman's was low. The defense reading of Dr. Herline's report, including Dr. Shuttleworth's reading, was to the contrary, that the final anastomosis was lower than Dr. Chapman's initial one.

(3), (4), and (5) Do the facts that the anastomosis passed Dr. Chapman's end-of-surgery leak test, that neither blood nor air appeared in the Foley catheter during surgery, and that Ms. McAbee did not complain of feces in her urine for nearly two weeks following surgery, suggest that the fistula was caused during surgery or developed thereafter as a result of anastomotic breakdown and bowel seepage? Dr. Chapman and his experts thought all of these facts were inconsistent with a stapling injury but consistent with the fistula-by-erosion theory. Dr. Kodner testified that none of these facts ruled out a stapling injury (although he was confronted on cross-examination with his deposition testimony to the effect that a stapling injury would be apparent in a very few days), and that Dr. Fellows's discovery of loose staples in the fistulous tract suggested staples as the cause.

Defense counsel was utterly meticulous in making the five critical defense points with every witness in a position to contribute to them, and he returned to them expressly during closing argument, arguing that for each one the evidence supported the defense position. Given this crystal clear strategy, even had Dr. Shuttleworth been sequestered, it was inevitable that during direct examination defense counsel would have apprised him of Dr. Kodner's testimony regarding the Herline report and asked him, effectively, whether he thought Dr. Kodner's take on that report was off the mark. At the very least, there is no doubt that counsel would

have asked him, as he did Dr. Cheadle, the other defense expert, (who was not present for Dr. Kodner's testimony) how he understood Dr. Herline's report, making sure to underscore the defense expert's disagreement with the key points of Dr. Kodner's interpretation and in particular emphasizing that, in the defense expert's view, Dr. Herline reported making his anastomosis lower on the rectum than Dr. Chapman had made his. In these circumstances, then, the trial court's failure to sequester Dr. Shuttleworth, although erroneous, did not bear significantly on the testimony presented to the jury and was harmless.

## CONCLUSION

In sum, we agree with Ms. McAbee that in civil as well as criminal cases KRE 615 applies to both expert and lay witnesses. Further Dr. Chapman failed to make an adequate showing of necessity justifying his request to exempt the expert witnesses from the general rule of witness separation. Dr. Shuttleworth should not, therefore, have been in the courtroom to hear Dr. Kodner's testimony. Despite the error and the importance of Dr. Shuttleworth's testimony, there was no resulting harm. There is no credible basis for concluding that Dr. Shuttleworth's testimony was improperly affected by what he heard during Dr. Kodner's testimony, and thus no reason to conclude the error in applying KRE 615 swayed the jury or affected the judgment. The error, in other words, was harmless, and for that reason we hereby affirm the Court of Appeals's affirmance of the Judgment of the Hopkins Circuit Court.

All sitting. All concur.