CORRECTED: JULY 25, 2019
RENDERED: JUNE 13, 2019
TO BE PUBLISHED



**Supreme Court of Kentucky**

2017-SC-000291-MR

LARA PAIGE CONLEY                                           APPELLANT

V.
ON APPEAL FROM KENTON CIRCUIT COURT
HONORABLE KATHY LAPE, JUDGE
NO. 2015-CR-00278

COMMONWEALTH OF KENTUCKY                              APPELLEE

## OPINION OF THE COURT BY JUSTICE BUCKINGHAM

## VACATING AND REMANDING

The U.S. Supreme Court held in *Ake v. Oklahoma*, 470 U.S. 68 (1985), that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense[.]" *Id.* at 83. The application of the principles in *Ake* by the trial court in this case led to errors that require us to vacate Lara Paige Conley's conviction and 27-year sentence for the murder of her mother and remand the case for a new trial.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Conley testified that on the night of the incident (March 24, 2015), she and her mother, Carlene Conley, had been arguing, as they frequently did. According to Conley, at one point her mother hit her in the head with a heavy

object as Conley was letting her dog out of its cage. After wrestling on the kitchen floor, Conley stabbed Carlene to death. According to Conley, she has no memory of the fight or calling 911.

Citing KRS[1] 31.185, Conley, who was indigent, initially filed a motion seeking funds to hire a mental health expert to assist her in preparing for trial. She supported her motion with evidence that she has a history of various mental illnesses, including bipolar disorder, disassociation, depression, post-traumatic stress disorder, anxiety, and panic attacks. Further, the circumstances surrounding the murder, including 77 stab wounds, 27 incise wounds, and two bite marks to Carlene's body, raised clear indications that there were potentially significant mental health issues involved in the case that might prove crucial to Conley's defense.

Stating that the motion "failed to establish reasonable necessity," the trial court denied the motion. In lieu of authorizing funds for a private expert witness, the court instead ordered Conley to KCPC[2] for a mental evaluation that was conducted by staff member Dr. Amy Trivette. That order was in substitution of Conley's request for an independent mental health expert.

Following the completion of Dr. Trivette's report, the trial court reversed its initial ruling and held that Conley was entitled to an independent mental health expert under *Ake*, and it authorized funds for Conley to retain Dr. Ed Conner as an expert witness. The Commonwealth subsequently invoked its

---

[1] Kentucky Revised Statutes.

[2] Kentucky Correctional Psychiatric Center.

2

right to a mental health expert to contest Dr. Conner's findings and opinions. *See* RCr[3] 8.07(2)(B). The trial court resolved the Commonwealth's request for an expert witness by effectively repurposing Dr. Trivette from her initial role as Conley's witness to the new role of being the Commonwealth's witness. Under this ruling, Dr. Trivette "changed sides" and became a witness against Conley.

At the end of the trial, the trial court instructed the jury on wanton and intentional murder, first-degree manslaughter (extreme emotional disturbance (EED) with no intent to kill), second-degree manslaughter, and all perfect and imperfect self-protection defenses. The self-defense instructions included, over Conley's objection, an initial aggressor qualification instruction. The jury found Conley guilty of murder and recommended a sentence of 27 years in prison. The trial court entered a judgment consistent with the jury's verdict and sentencing recommendation. This appeal by Conley followed.

## II. MENTAL HEALTH ISSUES AND CONLEY'S ENTITLEMENT TO AN EXPERT WITNESS UNDER *AKE v. OKLAHOMA*

Conley initially filed an *ex parte* motion for funds to retain Dr. Ed Connor "to assist with preparation of the client's defense." In her motion Conley informed the court that she had records documenting her history of mental health issues and that she had consumed large quantities of vodka daily, had not slept in three or four days, and had ingested a very large quantity Dramamine close in time to the stabbing. The motion further noted that

---

[3] Kentucky Rules of Criminal Procedure.

3

Conley had suffered injuries the night of the stabbing and had been treated previously for abuse by her mother.

The motion also specifically stated it would not be appropriate to send Conley, who was indigent, to KCPC because "by their own admission and policy they cannot act as a defense expert witness." Conley attached a letter from KCPC to that effect to her motion. KCPC stated in its letter that it "cannot act in the capacity of a defense expert," that KCPC's "interviews with inmates are not confidential," and that "we do not consult with defense attorneys to help them cross-examine prosecution witnesses." In other words, the KCPC letter indicated it would not provide its services as an independent mental health expert loyal to the defense such as would be expected under *Ake* principles.

The trial court denied Conley's motion for funds to hire Dr. Connor on the basis that the defense "failed to establish reasonable necessity for same." See *Woodall v. Commonwealth*, 63 S.W.3d 104, 126 (Ky. 2001) (the standard of review for a claim of error with respect to a court's denial of a defendant's motion for funding to conduct additional neuropsychological testing is whether there was a reasonable necessity for such funding). Under the circumstances of this case, where Conley had an extensive history of prior mental illness, her potential intoxication at the time of the stabbing, and, most importantly, the horrendous injuries that were inflicted upon her own mother, we conclude the trial court erred by denying Conley funds to hire Dr. Conner at the time of this initial ruling.

4

In lieu of providing funds for a mental health expert, the trial court instead, inconsistently with the objective of Conley's motion, referred her to KCPC for a criminal responsibility examination. The trial court obviously intended its ruling to be that the KCPC examination would be for Conley's benefit and use in the preparation of her defense and in substitution for her request for a private mental health expert. Clearly, KCPC interpreted the order that way as well because upon the completion of her report, Dr. Trivette sent it directly to defense counsel. Thereafter, Conley was admitted to KCPC and evaluated by Dr. Amy Trivette, who concluded that Conley was not absolved from her involvement in the death by reason of insanity.

Conley subsequently renewed her request for expert witness funds to hire Dr. Connor. In her motion Conley contended that Dr. Trivette's examination was insufficient because all KCPC did was examine her for criminal responsibility, but that she needed an independent expert such as Dr. Connor who would investigate and evaluate all her psychological issues, including other possible relevant mental health issues, possible EED issues, and potential mitigation factors at sentencing.

Ultimately, the trial court relented, reversed its original ruling, and allocated funds for Conley to retain Dr. Conner as a mental health expert witness. Because of other continuing errors relating to the issue, however, this belated allocation of funds to retain Dr. Conner did not fully cure the prejudice associated with the initial error in denying Conley's motion for expert witness funds and instead sending her to KCPC.

Subsequently, Conley filed notice of her intention to introduce expert testimony relating to mental illness as to the issues of guilt and punishment pursuant to RCr 8.07(2)(A)(iii). In response the Commonwealth filed a motion for a rebuttal mental health examination pursuant to RCr 8.07(2)(B). In its motion the Commonwealth stated it wanted the KCPC criminal responsibility report prepared by Dr. Trivette in lieu of a separate independent mental health examination, and it requested a copy of her report from defense counsel. Defense counsel refused to provide the report, stating the Commonwealth was not entitled to Dr. Trivette's report because Conley was not raising an insanity defense. The Commonwealth responded that it appeared the defense was going to mount an EED defense and that it was entitled to the report.

Conley noted she had not wanted to go to KCPC in the first place, but the court would not give other funding. Therefore, she maintained she was, in effect, forced into that situation because, as the trial court's order in sending her to KCPC was part of the defense investigation, the report was protected attorney-client work product, and the Commonwealth was therefore not entitled to it. In opposition to providing the KCPC report, Conley also noted she had now retained an independent mental health expert, Dr. Conner, and that the Commonwealth would receive his report when complete. She further argued that the Commonwealth was not entitled to the KCPC report because she would not be using the report at trial.

The Commonwealth maintained it should get the KCPC report because it would moot the need for an independent mental health examination as a

6

rebuttal to Dr. Conner. Conley agreed the Commonwealth was entitled to their own examination of Conley pursuant to RCr 8.07(2)(B), but she contended the Commonwealth was not entitled to the KCPC report because it was protected defense work product, and further, it would create a conflict of interest if the Commonwealth were to be adjudged entitled to the report. Conley argued that the only reason the Commonwealth would be entitled to the KCPC report was if she were mounting a criminal responsibility defense—an insanity defense—which she was not.

The trial court initially agreed with Conley that it was a conflict of interest for the Commonwealth to get the KCPC report but held that the Commonwealth was otherwise entitled to have Conley independently evaluated. The trial court also acknowledged it had forced Conley to go to KCPC and if Conley was not indigent, she would not have been sent there and the Commonwealth would not have known she had been examined for criminal responsibility and/or other mental health issue defenses in mitigation. Based upon these factors, the trial court denied the Commonwealth's request for Dr. Trivette's report.

While the foregoing possibly may have salvaged the original error in failing to timely grant Conley's motion for funds for a mental health expert, that prospect disappeared when the trial court backtracked and instead entered an order granting the Commonwealth the right to a copy of Dr. Trivette's report. More importantly, the effect of the trial court's February 3, 2017, order was to

7

designate Dr. Trivette as the Commonwealth's mental health expert, thereby switching Dr. Trivette from Conley's side to the Commonwealth's side.

The trial court held it would be counter-productive to require the Commonwealth to procure another evaluation of Conley concerning her criminal responsibility when Dr. Trivette had already undertaken that evaluation. The trial court also entered another short-lived order directing Conley's statements made during the Dr. Trivette's examination would not be admissible, though it later reversed this ruling as well, which further extended the original error by permitting what was originally Conley's expert, Dr. Trivette, to later impeach Conley at trial with the fruits of the KCPC examination.

## A. The court should have summarily granted funds for a defense examination pursuant to *Ake v. Oklahoma*

Conley contends the trial court erred by failing to grant her initial request for funds to hire a mental health professional and instead ordered that a criminal responsibility examination be conducted by KCPC. Conley maintains that this action, in effect, assigned KCPC, an institution that had explicitly represented it could not fulfill that duty, the function of providing a staff psychiatrist to act as Conley's mental health professional. We agree.

Based upon the U.S. Supreme Court's holding in *Ake v. Oklahoma*, 470 U.S. 68 (1985), and our holding implementing the *Ake* standard in *Binion v. Commonwealth*, 891 S.W.2d 383 (Ky. 1995), we agree with Conley that, as an indigent, her constitutional right to the appointment of an independent mental

8

health professional was violated by the trial court's denial of her initial request for funding for a mental health expert and instead ordering her to KCPC. We further hold that subsequent events, including the trial court's eventual allocation of funds to hire Dr. Conner, failed to adequately remediate that initial constitutional violation and that this initial constitutional deprivation was not harmless beyond a reasonable doubt. See *Chapman v. California*, 386 U.S. 18 (1967).

The facts in this case immediately called into question Conley's mental condition. As noted in the autopsy report, Conley did not merely stab her mother to death; rather, in causing her death, Conley stabbed her mother 77 times, cut her 27 times, and bit her at least twice. The circumstances compel an instantaneous doubt concerning the mental condition of anyone who would commit such a vicious act against her own mother.

"[I]f sanity at the time of the offense is to be a significant factor at trial, the state must, at a minimum, assure the defendant access to a competent mental health expert who will conduct an appropriate examination and assist in evaluation, preparation and presentation of the defense." *Binion v. Commonwealth*, 891 S.W.2d 383, 385 (Ky. 1995), citing *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985) (holding indigents have a right under the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the same access to necessary mental health expert assistance as a person of means).

Based upon the extreme violence associated with Conley's stabbing of her mother, along with the other factors contained in Conley's motion,

9

including her mental health history, "[c]ertainly, there was a reasonable basis" to conclude Conley "was suffering from insanity or acting from a diminished capacity during the commission of the crime and that [she] was entitled to either the appointment of, or the funds necessary, to employ a competent mental health expert for assistance in the evaluation and presentation of his defense." See *Binion* at 385 (*citing* KRS 31.185 and KRS 31.200).

Based upon the extraordinary circumstances of this case, it was evident from the outset that Conley's sanity at the time of the offense had the potential to be a significant factor at trial, and thus it was the trial court's duty to assure Conley had access to "a competent mental health expert who [would] conduct an appropriate examination and assist in evaluation, preparation and presentation of the defense." *Ake* at 83. And, KCPC would not provide that assistance.

The Commonwealth argues that KRS 31.185 gave the trial court discretion in its allowance of funds for an expert witness. KRS 31.185(1) provides as follows:

> Any defending attorney operating under the provisions of this chapter is entitled to use the same state facilities for the evaluation of evidence as are available to the attorney representing the Commonwealth. *If he or she considers their use impractical, the court of competent jurisdiction in which the case is pending may authorize the use of private facilities* to be paid for on court order from the special account of the Finance and Administration Cabinet.

(emphasis added).

Through its use of the term "may," KRS 31.185(1) confers the trial court with a degree of discretion in evaluating whether the use of KCPC or any other

10

state facility is "practical" in an individual case. "Under [KRS 31.185] the authorization to use private facilities paid for by public funds is a matter within the discretion of the trial judge based on a finding that the use of state facilities is impractical." *Binion* at 385 (citing *Hicks v. Commonwealth*, 670 S.W.2d 837 (Ky. 1984)); *see also White v. Commonwealth*, 500 S.W.3d 208, 212 (Ky. 2016)[4] ("Nothing in this provision *requires* the use of private psychological evaluations to be paid for with public funds. That determination is within the discretion of the trial court.") (emphasis in original), and *Commonwealth v. Wooton*, 269 S.W.3d 857 (Ky. 2008). While the statute gives discretion to the trial court in allotting funds for private facilities or expert witnesses, such discretion cannot be deemed to be unfettered considering *Ake* and *Binion*.

Under these circumstances, we conclude the trial court abused its discretion by refusing to grant Conley's initial motion for mental health expert witness funding and instead sending her to KCPC. See *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) ("The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.").

The Commonwealth argues on appeal, however, that any error in the trial court's failure to initially grant Conley's motion to retain an expert was harmless because Conley was later granted the funds to retain Dr. Conner, and thus any initial error was thereby cured. We conclude, however, that any

---

[4] Abrogated on other grounds by *Woodall v. Commonwealth*, 563 S.W.3d 1 (Ky. 2018).

11

mitigating effect in the belated award of funds to hire Dr. Conner was negated

by the derivative errors associated with the initial ruling. These included the

forcing of Conley to a KCPC examination by Dr. Trivette, whose assistance

manifestly did not meet the *Ake* standard based upon KCPC's own disclaimer.

In considering the harmlessness of the above errors, Dr. Trivette's "side

switching" is crucial to our review. In *State v. Larkin*, 443 S.W.3d 751 (Tenn.

Crim. App. 2013), the Court of Criminal Appeals of Tennessee addressed the

issue of a defense expert's "switching sides" to testify for the prosecution after

first assisting the defendant:

> [A]n expert witness' switching sides and opinions after working for
> the defense places defense counsel at trial in the "untenable
> position" of both needing to accredit the expert's first opinion while
> simultaneously needing to discredit the expert's subsequent
> opinion. A focus on issues of confidentiality completely overlooks
> this crucial aspect of a criminal defendant's constitutional rights to
> counsel, to present a defense, and to confront his accusers.

*Id.* at 793.

Despite the Tennessee court's concerns, it declined to apply a *per se*

disqualification rule for experts who switch sides. *Id.* at 798. The Court

instead adopted the following test for evaluating these situations:

> [T]he appropriate test to be applied for assessing whether an expert
> witness who previously was employed as an expert on behalf of a
> defendant later may testify as an expert for the State on the same
> or substantially similar subject matter in a subsequent criminal
> prosecution of the defendant is whether an ordinary person
> knowledgeable of all the relevant facts would conclude that
> allowing the expert to switch sides poses a substantial risk of
> disservice to the public interest and/or the defendant's
> fundamental right to a fair trial. Additionally, in making this
> determination, trial courts should consider the following
> nonexclusive list of factors: (1) whether the State could have

obtained a different expert witness and, if so, under what conditions; (2) whether the defendant hired the expert first in order to preclude the State from using the expert; (3) whether, in addition to switching sides, the expert switches opinions; (4) whether the expert obtained any confidential or privileged information from the defendant; (5) the expert's reasons for switching sides and, if relevant, the reasons for changing his or her opinions; (6) the significance of the issue about which the expert is testifying; (7) the terms of the prior relationship between the defendant and the expert; and (8) the timing of the expert's switching sides.

*Id.* at 801.

We believe the analysis adopted by Tennessee in *Larkin* presents an accurate and practical test for evaluating whether it is proper for expert witnesses to switch sides under circumstances such as this. And, while we need not go into each factor listed in this test in detail, we note that the Commonwealth here could have obtained an expert witness other than Dr. Trivette in consideration that she had first served as Conley's expert; that Conley did not hire Dr. Trivette first in order to preclude the Commonwealth from using the expert, but rather Dr. Trivette was forced upon her in lieu of her request for a private mental health expert; that Dr. Trivette did obtain confidential or privileged information from Conley during the KCPC examination; that Dr. Trivette's reason for switching sides was as a result of the trial court's error in, in effect, mandating that she do so in its February 3, 2017, order; and that the issue about which Dr. Trivette was testifying was of crucial significance to Conley's defense.

Even though the trial court eventually permitted funds to Conley to retain Dr. Conner, because the trial court at the same time permitted the

13

Commonwealth to commandeer Dr. Trivette to testify against Conley, the trial court's subsequent ruling did not fully "get the train back on the tracks" because of the side-switching error (which, as further explained below, resulted in yet other derivative errors). Further, the error at issue was of a constitutional magnitude because it deprived Conley of the same advantage as would be available to a person of means as required in *Ake*. A person of means would not have been subjected to the initial denial of funds or being sent to an institution that declared it could not act as an independent defense expert and would not have been subjected to the side-switching.

"[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Winstead v. Commonwealth*, 283 S.W.3d 678, 689 n. 1 (2009) (citing *Chapman v. California*, 386 U.S. 18 (1967); RCr 9.24 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties."); see also *Spears v. Commonwealth*, 448 S.W.3d 781, 787 (Ky. 2014).

Conley did not ultimately seek total exoneration for her mother's death by reason of insanity. By reason of the horrible nature and number of the wounds, Conley's history of mental illness, and the apparent presence of various substances in her body that evening, she likely had a plausible EED defense to potentially lower her culpability to first-degree manslaughter. The development of that defense could have been aided by a mental health expert

14

from the outset.[5] Further, a mental health expert would have been crucial to her development of mitigation evidence during the sentencing phase of the trial. Under the totality of the circumstances, with one misstep after another, all flowing from the initial error of failing to allow funds for a mental health expert from the outset, we are unable to conclude that the errors described were harmless beyond a reasonable doubt.

We note, however, that the trial court's rulings perhaps were understandable due to the lack of clearer guidance from the appellate courts concerning how situations such as this should be approached. Given the stark facts of this case, we use this opportunity to expand upon our holding in *Binion* and further clarify the appropriate use of KCPC in cases involving criminal responsibility and associated defenses and to further discuss a defendant's entitlement to the appointment of a mental health expert under *Ake* in contrast to whether a defendant is competent to stand trial under KRS 504.100 and RCr 8.06, which is a normal and routine function of KCPC.

We begin by noting the difference between a defendant being sent to KCPC for a competency to stand trial examination pursuant to KRS 504.100 and a defendant in need of an expert witness to assist him or her in pursuing a

_____

[5] It is not beyond reason to suppose that an early-stage evaluation, such as a person of means may have obtained, would have revealed that an exculpatory insanity defense was viable under these circumstances. We do not construe *Ake* as requiring that a defendant announce by formal notice that he or she is definitively pursuing an insanity defense before being entitled to the appointment of a mental health expert under that decision. Rather, the standard under *Ake* for appointment of counsel is whether insanity is likely to be an issue in the trial, such as here.

defense based on insanity or other mental illness or condition.[6] KRS 504.100 requires the trial court, if it has reasonable grounds to believe the defendant is incompetent to stand trial, to appoint a psychiatrist or psychologist to report on the defendant's competency to stand trial for the crime charged. *Gabbard v. Commonwealth*, 887 S.W.2d 547, 550 (Ky. 1994). Generally, the function of a competency to stand trial proceeding conducted through KCPC is for the benefit of the trial court to assess whether a defendant has the present mental capabilities to communicate with trial counsel and assist in his or her own defense. The expert witness appointed under KRS 504.100 for a competency to stand trial evaluation at KCPC does not "belong" to the defendant, but rather the expert acts as an agent of the trial court. Cf. *Cain v. Abramson*, 220 S.W.3d 276, 280 (Ky. 2007) (a mental health expert retained by the Commonwealth to evaluate a defendant's competency to stand trial pursuant to a motion under KRS 504.070 and RCr 7.24(3)(B)(ii) "is not a legal adversary or an 'agent of the prosecution[ ]'").

In contrast, a mental health expert to which an indigent defendant may be entitled under *Ake* serves the purpose of assuring that a defendant is placed upon the same footing as a person of means in assessing possible defenses and trial strategies relating to his mental state at the time the crime was committed. *Ake* at 77. An expert appointed under *Ake* may accurately be

---

[6] "The inquiry into a defendant's competency is very different and distinct from an inquiry into whether a defendant is criminally responsible for the acts with which he is charged." *Bishop v. Caudill*, 118 S.W.3d 159, 162 (Ky. 2003).

16

described as "belonging" to the defendant, unlike the evaluator acting as an agent of the trial court in a competency to stand trial proceeding.

In cases such as this, where a strong indication exists that the defendant may be suffering from mental issues compelling the appointment of a mental health expert under *Ake*, for practical reasons KCPC should not be designated as the indigent defendant's mental health expert. First, as reflected in the KCPC letter in this case, KCPC unambiguously disclaims the authority of its staff members to act in such a capacity. Therefore, under these circumstances the trial court should invoke its duties under *Ake* and allot funds to the defendant so that he or she may defend himself or herself pursuant to the constitutional standards described in that decision.

Further, in such cases where an *Ake* expert witness is obviously required, the Commonwealth in the normal course of events will seek its own mental health expert as a rebuttal witness. KCPC, as a state mental health facility, is logically situated to provide that rebuttal expert. It would not make sense for that reason, too, to consider KCPC as a viable alternative for the defendant when, as here, there is an unambiguous presentation of mental illness that may be significant to the defendant's case, and KCPC will necessarily and foreseeably be needed by the Commonwealth to act as its expert.

Finally, we note that perhaps the more common situation is where, unlike here, the facts are ambiguous and inconclusive as to whether the defendant is entitled to a mental health expert from the outset. In such

17

situations, the trial court may properly send the defendant to KCPC for an evaluation to assist the trial court (often perhaps in conjunction with a competency evaluation), for its own benefit, not the defendant's, to determine in the first instance if the defendant qualifies for an outside independent mental health expert under *Ake*. *See* KRS 504.070. This procedure is consistent with our holding in *Binion*: "The trial judge properly required Binion to submit to an initial evaluation through KCPC. If such an evaluation is conducted by a qualified mental health professional capable of making an accurate and impartial appraisal of the mental status of the patient, it can be of great assistance to the trial judge in determining whether the insanity defense is appropriate and whether further action is necessary." 891 S.W.2d. at 385. In these circumstances the KCPC evaluator is again acting as an agent of the trial court, not the defendant.

Following the KCPC evaluation on behalf of the trial court in these ambiguous situations, if the trial court thereafter concludes the defendant is entitled to an expert under *Ake*, and the Commonwealth then seeks to retain KCPC to provide the prosecution with a rebuttal mental health expert, we believe *Ake* would compel that a second KCPC evaluator be assigned to act as the Commonwealth's expert witness and, to the extent practicable, the initial KCPC evaluator and evaluation should be "walled off" from the second evaluator who may then serve as the Commonwealth's expert at trial. Only in this way may an indigent defendant be equalized with a person of means defendant as required under *Ake*. That is, a person of means would not face

18

the specter of having an evaluator who first served as the trial court's agent in ascertaining her entitlement to a mental health expert under *Ake* later serving as the Commonwealth's expert at trial.

As a natural corollary to this walling-off requirement as applied to this case, to place Conley back on the same footing with a person of means, we conclude that upon retrial, to the extent practicable, neither Dr. Trivette nor her report may be used as evidence against Conley. As a further natural extension of this, we hold that upon remand the Commonwealth must be required to obtain a different mental health expert to testify against Conley and challenge Dr. Conner's opinions. As discussed, if available, a different KCPC staff member may be used for this purpose, so long as that staff member is walled-off from the fruits of Dr. Trivette's prior participation in the case; otherwise, upon retrial the Commonwealth should retain an expert witness unaffiliated with KCPC.

## B. The Commonwealth's entitlement to Dr. Trivette's KCPC criminal responsibility report

Conley contends the trial court erred by permitting the Commonwealth to have access to the report that Dr. Trivette prepared after her examination.

As noted above, to the extent practicable, evidence relating to Dr. Trivette's examination of, and report on, including any derivative testimony concerning Conley, should be excluded upon retrial. A person of means would not now be in this side-switching predicament. Therefore, pursuant to *Ake*, the fruits of the erroneous trial court order that interjected Dr. Trivette into

19

Conley's efforts to defend herself against the murder charge should be excluded upon retrial, including her report and testimony. Further, Dr. Trivette should be walled-off from any further examinations of Conley by KCPC upon remand.

Upon remand, in assessing whether each side is entitled to the other's mental health expert reports, the trial court should follow the standards set forth in RCr 8.07 and RCr 7.24(3)(a).

## C. The Commonwealth's use of Conley's prior inconsistent statements to Dr. Trivette against her at trial

Conley contends that the trial court erred by permitting Dr. Trivette to impeach her by testifying she had made various statements during her evaluation that were inconsistent with statements she made during her trial testimony. Pursuant to our above discussion, neither Dr. Trivette nor the fruits of her examination will be admissible upon retrial. Thus, the issue is moot.

## D. Alleged insufficient notice of Dr. Trivette's expert opinion and failure to exclude her from the courtroom during Dr. Connor's examination

Based upon our disposition above, this issue is moot as well. If the issue arises again on remand in connection with another expert witness, the trial court should apply the expert witness disclosure rules contained in RCr 8.07 and RCr 7.24.

In assessing whether each party's expert witnesses may be in the court room when the other testifies, the trial court should follow the requirements

20

as explained in *McAbee v. Chapman*, 504 S.W.3d 18 (Ky. 2016), and KRE[7] 615.

Significantly, under *McAbee*, because a court may decline a party's request to sequester a witness only if one of the rule's three express exemptions applies, KRE 615 creates a strong presumption in favor of sequestration. *McAbee* at 24. Further, *McAbee* holds that the party opposing the presumption in favor of sequestration of witnesses bears the burden of showing that one of the exemptions applies. *Id.* And, the proponent of the exception to witness sequestration must do more than show that the witness's presence is simply desirable or helpful; it is not enough to show that the witness's testimony is apt to be important. *Id.* at 27. *McAbee* further holds, however, that if an opinion expert's only way to learn the facts material to his or her opinion is to hear the trial testimony of other witnesses, then a trial court abuses its discretion by sequestering that expert. *Id.* at 29.

Upon retrial, the trial court should consider these principles as stated in *McAbee* in considering whether expert witnesses should be excluded from hearing the testimony of other witnesses.

**E. Testimony elicited by the Commonwealth from Dr. Connor and Dr. Trivette that Conley was aware of the criminality of her conduct and that she was able to appreciate the consequences of her acts was overemphasized and therefore improper**

---

[7] Kentucky Rules of Evidence.

In both Dr. Conner's and Dr. Trivette's testimony, the Commonwealth asked the experts whether, when Conley committed the crimes, she was aware of the criminality of her conduct and whether she was able to appreciate the consequences of her acts. In its questioning of these witnesses, the Commonwealth continually emphasized the point, and it further emphasized the point in its closing argument.

The phrasing of the questions directly implicates the language of the insanity defense statute, KRS 504.020(1). As Conley was not pursuing an insanity defense, we conclude that overemphasizing insanity defense terminology was improper because inquiry into that question was not relevant or, even if relevant, the probative value was substantially outweighed by the prejudice and confusion that would likely result by using terms related to insanity when insanity was not an issue in the case. *See* KRE 401-403.

Therefore, upon retrial the trial court should not permit the Commonwealth to unduly overemphasize evidence relating to an insanity defense under KRS 504.020 as in the first trial unless Conley raises such a defense. However, brief references to KRS 504.020 terminology may be admissible at the trial court's discretion as may be necessary for the experts to fully explain their conclusions and opinions.

### III. OTHER ISSUES WHICH MAY RECUR UPON RETRIAL

Conley raises multiple other arguments for reversal that, based upon our disposition above, are now moot insofar as this appeal is concerned. Because

22

the issues may arise again upon retrial, we address them as necessary to provide guidance should the issues again arise.

## A. Admissibility of Prior Bad Acts under KRE 404(b)

Conley alleges error occurred because of four instances where the Commonwealth was permitted to introduce evidence of prior bad acts she allegedly committed: (1) her prior assaults on Chris Long and Carlene Conley; (2) evidence concerning jail phone calls and video chats; (3) Conley's threat on instant messenger "to kill the trick or treaters"; and (4) her theft of an ink pen during a police interrogation.

KRE 404(b) provides, in relevant part, as follows:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:

(1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

Generally, evidence of crimes other than that charged is not admissible. KRE 404(b). Evidence of other crimes or wrongful acts may be introduced as an exception to the rule, however, if relevant to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. KRE 404(b)(1). To be admissible under any of these exceptions, the acts must be relevant for some purpose other than to prove criminal predisposition, and they must be sufficiently probative to warrant introduction.

23

*Clark v. Commonwealth*, 833 S.W.2d 793, 795 (Ky. 1991).[8] Further, the probative value of the evidence must outweigh the potential for undue prejudice to the accused. *Id.*; see also *Chumbler v. Commonwealth*, 905 S.W.2d 488, 494 (Ky. 1995).

KRE 404(b) is "exclusionary in nature," and as such, "any exceptions to the general rule that evidence of prior bad acts is inadmissible should be closely watched and strictly enforced because of [its] dangerous quality and prejudicial consequences." *O'Bryan v. Commonwealth*, 634 S.W.2d 153, 156 (Ky.1982). To determine the admissibility of prior bad act evidence, we have adopted the three-prong test described in *Bell v. Commonwealth*, 875 S.W.2d 882, 889–891 (Ky. 1994), which evaluates the proposed evidence in terms of: (1) relevance, (2) probativeness, and (3) its prejudicial effect. We review the trial court's application of KRE 404(b) for an abuse of discretion. *Anderson v. Commonwealth*, 231 S.W.3d 117, 119 (Ky. 2007); *Driver v. Commonwealth*, 361 S.W.3d 877, 883 (Ky. 2012).

## 1. Prior assaults on Chris Long

Over Conley's objection, the trial court permitted the Commonwealth to introduce evidence of two prior acts of assault committed by Conley: (1) an October 28, 2014, assault where the police arrested Conley for stabbing her live-in boyfriend, Chris Long, with a kitchen knife and biting him; and (2) a

---

[8] As noted in *Ragland v. Commonwealth*, 476 S.W.3d 236, 249 (Ky. 2015), *Clark* was issued prior to the passage of our current Rules of Evidence; however, *Clark* applied the Federal Rule equivalent of KRE 404(b), and so the holding on this point remains sound.

January 7, 2015, assault where the police arrested Conley for allegedly biting Long on the finger as he tried to keep her from assaulting her mother.

The trial court admitted the 2014 episode because "[i]t involve[d] many of the same details as the underlying case: the location, the intoxicated Defendant, a heated argument and then, an assault consisting of Defendant biting Mr. Long and stabbing him with a knife." The trial court found "that the specifics of the event, show motive, opportunity, intent, preparation, as well as, modus operandi." The trial court admitted into evidence the 2015 incident because it involved "many of the same aspects: the parties living together, an intoxicated Defendant, a heated argument culminating in an assault, wherein Mr. Long was bitten."

As a further precaution, following Long's testimony the trial court admonished the jury that it could "consider the evidence only as it relates the Commonwealth's claim on Defendant's motive, intent, opportunity, preparation, as well as modus operandi," and not for any other purpose.

For the reasons explained by the trial court in its carefully considered decision to permit the use of the prior assault evidence, particularly considering the trial court's limitation admonition, we conclude the trial court did not abuse its discretion by admitting the evidence, and for those same reasons the evidence would be admissible upon retrial.

## 2. Jail phone calls and video chats

During Chris Long's testimony the Commonwealth introduced the records of three phone calls/video chats between him and Conley while she

was in jail. The first of these arose when the prosecutor asked Long if he ever talked to Conley about his potential trial testimony and he said no. In contradiction of this testimony, the prosecutor played the following recording:

> Conley: I don't know. [Defense Counsel] is not planning on using you as a witness because you were of no help. You might hurt me in the case. He said according to you, me and mom never fought. ...

> Long: No, I said y'all had a typical parent-child arguments and stuff kinda going off whatever. Not any different than the things I'd do with my dad.

> Conley: Neither one of us had typical relationships with our parents. Most people don't fight with their parents the way you and I did, sweetheart.

We conclude this evidence was admissible as a prior inconsistent statement by Long that demonstrates he had discussed his testimony with Conley and, therefore, was relevant to Long's veracity. Moreover, the testimony provided insight concerning possible coordination between Conley and Long concerning Long's trial testimony. The recording is also relevant because it provides insight into the relationship between Conley and her mother and thus provided the jury with additional background in assessing Conley's level of guilt in committing the stabbings.

The next recording concerns a conversation between Conley and Long that delved into the disturbing aspect of the case involving Conley inflicting bite wounds on her mother during the attack:

> Conley: Just a cop someone whose two feet from me going around telling people I ate mom. Right now I'm trying to mind my business....

26

Conley: You know what else they're saying? They took a shit sample from me when I got here. To see if they could find any traces of her in my digestive system. That's like ... sordid and sad. That's . . . smarter and it's not that I thought they weren't capable but . . . that's a head scratcher literally isn't it?

Later, during Conley's testimony, the prosecutor questioned her about laughing during the jail call when she talked about being tested to see if she "ate" her mother. We note first that Conley's statements in this recording are based entirely upon the supposed double-hearsay statements of the nearby officer and perhaps some other anonymous sources based upon jailhouse gossip. If being introduced for the truth of the matter, the statements are inadmissible hearsay. And, if introduced for some other purpose, that purpose is unclear, and we are unable to discern any relevance of the rumor to a fact in issue in the case.

Further, application of the *Bell* test discloses that the prejudicial effect of the testimony concerning "cannibalism" evidence far outweighs any probative value of the testimony. Upon retrial, in the absence of a stronger foundation and a showing of relevance, evidence relating to Conley having ingested portions of her mother should be excluded.

The final statement to which Conley objects relates to the board game Clue and a game played at the jail while Meleah Oldfield and Conley were incarcerated together. Oldfield testified she had played a game of Clue with Conley, and during the game Conley had taken a knife and put it in the kitchen and said, "The murderer was me. The killer was me." According to Oldfield, Conley then started laughing.

27

This testimony was properly admitted by the trial court. The testimony, if believed, demonstrated that Conley's true state of mind was inconsistent with her claimed EED defense. Accordingly, the testimony may again be admitted upon retrial.

### 3. Threat on instant messenger to kill the trick or treaters

During his testimony Detective Jim Moore read exchanges from a printout of Facebook instant messages from Conley's cell phone sent on the evening of the stabbing. On 8:28 p.m. that evening Conley sent a message stating: "They brandished a large knife threatened me and Sagan and most bizarrely said Trick or Treat." The other account responded back, "what a strange place, little pricks." Conley then responded back, "If I find these stupid cunts I will fucking kill them."

This exchange occurred about three hours before the stabbing, and Conley had told the police about this event in her statement following her arrest. Undoubtedly, the jury did not interpret Conley's threat to "kill" the unknown visitors literally, but rather as an expression of her anger at their threatening conduct at menacing her and her dog with a knife. Nevertheless, this evidence is related to events occurring the evening of the stabbing and corroborates a portion of Conley's later statement to the police. The evidence further provides the jury with insight into the emotional climate present in the household the evening of the stabbing, and we conclude the trial court did not abuse its discretion by permitting the introduction of this evidence at trial.

28

## 4. Theft of pen during police interrogation

During Officer Michael Brock's testimony, a portion of a video was played where Conley is left alone in an interrogation room and can be seen taking a pen from the table and putting it in her pants. During his cross-examination of Conley, the prosecutor played the video and asked her if that was what the video showed and why she did that.

This evidence is irrelevant to any issue in the murder case and is also irrelevant in showing Conley's motive, opportunity, intent, plan, knowledge, identity, or absence of mistake or accident in relation to the murder. *See* KRE 404(b)(2). Rather, the evidence merely reflects upon Conley's character. *See* KRE 404(b)(1). Upon application of the *Bell* test, we conclude this evidence should not be admissible upon retrial.

## B. Initial Aggressor Instruction

In addition to mental health issues, Conley also asserted a self-protection defense at trial. Conley contends the trial court erred by giving an adverse initial aggressor instruction under the facts of this case and that the instruction was prejudicial to her self-protection defense.

Conley's self-protection defense was premised upon her contention that the confrontation began because her mother was angry and frustrated with her and began the physical confrontation by hitting her on the head with something heavy. She contends that, coupled with her mental condition and her reaction to the stress of her mother's initial attack, only then did she launch her knife attack on her mother in self-defense.

29

When Detective Mike Richmond arrived at the Conley home, Conley had scratches and cuts on her arms and hands, the left side top of her head was bruised, and she had blood in her hair. Her examination at the police station disclosed that she had a cut on her head and behind her ear, bruises, and a black eye.

KRS 503.050 provides, in relevant part, as follows:

(1) The use of physical force by a defendant upon another person is justifiable when the defendant believes that such force is necessary to protect himself against the use or imminent use of unlawful physical force by the other person.

(2) The use of deadly physical force by a defendant upon another person is justifiable under subsection (1) only when the defendant believes that such force is necessary to protect himself against death, serious physical injury, kidnapping, sexual intercourse compelled by force or threat, felony involving the use of force, or under those circumstances permitted pursuant to KRS 503.055.[9]

The initial aggressor statute, KRS 503.060 provides, in part, as follows:

Notwithstanding the provisions of KRS 503.050, the use of physical force by a defendant upon another person is not justifiable when:

(2) The defendant, with the intention of causing death or serious physical injury to the other person, provokes the use of physical force by such other person; or

(3) The defendant was the initial aggressor, except that his use of physical force upon the other person under this circumstance is justifiable when:

> (a) His initial physical force was nondeadly and the force returned by the other is such that he believes himself to be in imminent danger of death or serious physical injury; or

---

[9] KRS 503.055 addresses the no duty to retreat/castle doctrines.

(b) He withdraws from the encounter and effectively communicates to the other person his intent to do so and the latter nevertheless continues or threatens the use of unlawful physical force.

In *Randolph v. Commonwealth*, 566 S.W.3d 576 (Ky.App. 2018), the Court of Appeals stated as follows:

As the Kentucky Supreme Court explained, albeit in an unpublished decision, "[t]he purpose of the initial aggressor doctrine, like the 'provocation doctrine', is to prevent a defendant from instigating a course of conduct then claiming he was acting in self-defense when that conduct unfolds." *Hayes v. Commonwealth*, 2015-SC-000501-MR, 2017 WL 639387, at *4 (Ky. Feb. 16, 2017).

*Id.* at 578.

Similarly, as stated in *Stepp v. Commonwealth*, 608 S.W.2d 371 (Ky. 1980), in determining whether a limitation to a self-defense instruction is proper, the trial court must consider the circumstance surrounding the incident as a whole:

It is not every assertion of such belief that is adequate to support a plea of self-defense. It is the whole circumstances which surround the incident that must be considered by the trial judge in deciding whether an instruction on self-defense is proper or whether an instruction on self-defense with limitations is proper. We have held that before such qualifying instructions are proper there must of course be evidence to justify it. In other words, the trial judge must find as a matter of law that there is sufficient evidence to justify such limitations before instructing the jury. *Mayfield v. Commonwealth*, Ky., 479 S.W.2d 578 (1972); *Crigger v. Commonwealth*, Ky., 225 S.W.2d 113 (1949).

*Id.* at 374.

For a defendant to be the initial aggressor, the defendant must use physical force prior to any act of purported self-protection. KRS 503.060(3)(a). Conley claims the Commonwealth presented no evidence that she used

31

physical force on Carlene prior to stabbing her, and, accordingly, there was no evidence to support giving a limiting initial aggressor instruction. We agree.

There simply was no evidence presented at trial, direct or circumstantial, that Conley was the initial aggressor in the confrontation to warrant an instruction diminishing her self-protection defense. Accordingly, if the evidence is the same upon retrial, that is, there is an absence of evidence that Conley was the initial aggressor, the trial court should not give an initial aggressor instruction.

**C. Admissibility of Detective Richmond's testimony that Conley remained silent on self-defense, EED, etc.; and restrictions in allowing her to cross-examine him on the same subject.**

Conley also contends error occurred because Detective Richmond testified that, during his post-arrest interview with her, she did not raise issues relating to self-defense and EED. Conley contends that this testimony was an improper comment on her right to remain silent.

After he had responded to the Conley home, Richmond asked Conley if she was willing to go to the police station and make a statement, and Conley agreed to do so. Prior to the interrogation, Richmond read Conley her *Miranda* rights.

At trial Richmond testified about his interrogation techniques and explained he was trying to give Conley the "out" of self-defense through his questioning. The prosecutor asked, "At any point in time did she say, you're

32

right, I was acting in self-defense?" Richmond responded she did not. The prosecutor then asked, "At any point did she say you're right, my mom attacked me, I was trying to defend my life?" Richmond said, "No, she didn't." The prosecutor followed up by asking, "At any point here as you were trying to give her that out, did she mention anything about being fearful for her life, from her mother on March 14, 2015?" Richmond responded, "No she didn't." The prosecutor later repeated those questions, and Richmond repeated his answers.

The prosecutor also asked Richmond the question, "You made the statement, 'if you and your mom got in a fight, tell me what happened.' At this point did the defendant say she had been acting in self-defense?" Richmond said, "She did not." Richmond also testified, however, that Conley told him her mother hit her on the head, but she did not know with what, and she had cuts to her arms and hands, but she did not know how they occurred.

Conley also claims the trial court erred by preventing her from cross-examining Detective Richmond concerning his claims that she did not assert she was acting in self-defense.

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Similarly, Section 11 of the Kentucky Constitution states, in pertinent part, "[i]n all criminal prosecutions the accused ... cannot be compelled to give evidence against himself[.]" In consideration of this bedrock constitutional right, we have held that "[t]he Commonwealth is prohibited from introducing

33

evidence or commenting in any manner on a defendant's silence once that defendant has been informed of his rights and taken into custody." *Hunt v. Commonwealth*, 304 S.W.3d 15, 35–36 (Ky. 2009) (citing *Doyle v. Ohio*, 426 U.S. 610, (1976), and *Romans v. Commonwealth*, 547 S.W.2d 128, 130 (Ky. 1977). For example, in *Romans* we held it was error to permit the Commonwealth to elicit from a police detective that at the time of arrest and interrogation, and after receiving *Miranda* warnings, the defendant "did not come forth with the explanation ... upon which he ultimately relied for his defense." *Romans*, 547 S.W.2d at 130; see also *Miranda v. Arizona*, 384 U.S. 436, 468 n. 37 (1966), and *Wainwright v. Greenfield*, 474 U.S. 284 (1985).

"The idea is that because *Miranda* warnings implicitly assure their recipient that his silence will not be used against him, it would be fundamentally unfair to allow a defendant's post-*Miranda* silence to be used for impeachment." *Hunt*, 304 S.W.2d at 36. However,

> it is clear that not every isolated instance referring to post-arrest silence will be reversible error. It is only reversible error where post-arrest silence is deliberately used to impeach an explanation subsequently offered at trial or where there is a similar reason to believe the defendant has been prejudiced by reference to the exercise of his constitutional right. The usual situation where reversal occurs is where the prosecutor has repeated and emphasized post-arrest silence as a prosecutorial tool.

*Id.* (citing *Wallen v. Commonwealth*, 657 S.W.2d 232, 233 (Ky. 1983)).

Conley is a layperson, and she would not be expected to know and understand the law of self-defense and EED; indeed, she may not have known what an EED defense was at the time of her statement. Further, she had just

stabbed her mother 77 times, cut her 27 times, and bitten her twice. In addition, she was without counsel.

Conley did, however, tell Detective Richmond that her mother had hit her over the head with an object at the outset of their final confrontation, and she further explained to him that she could not remember many of the events that night.

We made clear in *Romans* that the Commonwealth may not elicit testimony that at the time of interrogation, and after receiving *Miranda* warnings, the defendant "did not come forth with the explanation ... upon which he ultimately relied for his defense." *Romans*, 547 S.W.2d at 130.

Upon retrial the trial court should apply the above authorities to assure improper commentary that Conley did not reveal her trial strategy during her police interrogation does not occur.

In considering whether it is proper to limit Conley's right to cross-examine any witness, the trial court should follow our discussion of the issue in *Commonwealth v. Armstrong*, 556 S.W.3d 595, 602-03 (Ky. 2018).

**D. Officer Smith's undisclosed statement by Conley**

Conley next contends that error occurred because Officer Scott Smith was permitted to testify concerning a statement Conley made shortly after the stabbing that was not provided to the defense as required by RCr 7.24(1). Because Conley is now aware of the statement and will be positioned to defend against it upon retrial, we need not discuss this issue.

35

**E. Sixth Amendment right to confrontation issues concerning Dr. Ralston's testifying about an autopsy he did not perform.**

The Commonwealth filed a motion *in limine* that Dr. William Ralston be permitted to provide expert testimony on the cause and manner of death instead of Dr. Michael Belenky who performed the autopsy. The reason offered was Dr. Belenky was no longer employed at the medical examiner's office. The motion further noted that Dr. Ralston had independently reviewed the photos, findings and reports of the autopsy, and had issued his own independent expert opinion regarding the cause and manner of the victim's death.

The defense objected that this violated the Confrontation Clause. Citing KRE 804, the trial court ruled that Dr. Ralston could testify in lieu of Dr. Belenky because Dr. Belenky was unavailable, as he was no longer employed by the medical examiner's office and was not present in the Commonwealth.

While Dr. Belenky may qualify as an unavailable witness under KRE 804(a)(5), it is not clear that any of the hearsay exceptions under KRE 804(b)(1)-(4) are applicable to this situation.[10] Accordingly, we are persuaded that the trial court's exclusive reliance upon KRE 804 was misplaced.

We have previously held an autopsy report is admissible under the "record of regularly conducted activity" exception contained in KRE 803(6).

---

[10] These exceptions are limited to (1) cross-examined former testimony; (2) statement under belief of impending death; (3) statement against interest; or (4) statement of personal or family history.

*Kirk v. Commonwealth*, 6 S.W.3d 823, 828 (Ky. 1999). And indeed, Conley does not challenge the admissibility of the autopsy report upon hearsay grounds, rather her argument rests upon Confrontation Clause grounds.

In *Crawford v. Washington*, 541 U.S. 36, 59 (2004), the U.S. Supreme Court held that out-of-court testimonial statements by witnesses are barred under the Confrontation Clause unless the witnesses are unavailable and defendants had a prior opportunity to cross-examine those witnesses.

In *Commonwealth v. McKee*, 486 S.W.3d 861, 869 (Ky. 2016), we considered whether the Commonwealth's introduction of a medical report stating a wanton-murder victim was not intoxicated violated McKee's right of confrontation under *Crawford* and *Davis v. Washington*, 547 U.S. 813 (2006). In reaching the conclusion that the medical report was nontestimonial we stated as follows:

> Although the Supreme Court has not articulated an all-encompassing test for what constitutes a testimonial statement, it has suggested that the core concern is with statements that either consist of actual testimony at a prior trial, are otherwise made under oath, or are made in circumstances that resemble the sort of examination that would occur at trial. Thus, statements are testimonial if made in prior testimony or in a police interrogation, *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354, outside the emergency setting, *Davis*, 547 U.S. at 822, 126 S.Ct. 2266. This extends to statements made to "persons who are not police officers, but who may be regarded as agents of law enforcement." *Hartsfield v. Commonwealth*, 277 S.W.3d 239, 244 (Ky. 2009). This category includes medical personnel, such as sexual assault nurse examiners, "acting in cooperation with or for the police" in the course of an investigation. *Id.* But it does not extend to all medical personnel. And even then the concern is with statements made to the person acting on behalf of the police, not statements made by the medical personnel as part of diagnosis or treatment.

37

> Here, the supposedly testimonial statements were those made by emergency medical personnel describing Wenrick's physical condition soon after the wreck. Although those statements may run afoul of the hearsay rules, they do not violate the Confrontation Clause because they are not testimonial. *Crawford*, 541 U.S. at 51, 124 S.Ct. 1354 (noting "that not all hearsay implicates the Sixth Amendment's core concern"). Indeed, if that were the case, then all statements in medical records would run afoul of the right to confront witnesses, and clearly that is not the case. So while it is arguable that counsel failed to properly object to hearsay, that hearsay does not present a *Crawford* issue.

*McKee*, 486 S.W.3d at 869–70. We conclude that the same reasoning applies to the autopsy report at issue here, and we therefore hold that in the usual case an autopsy report prepared by a medical examiner's office is nontestimonial and thus does not implicate Confrontation Clause concerns.

Our conclusion above is further supported by decisions from sister-states addressing this identical issue. For example, in *State v. Pandeli*, 242 Ariz. 175, 394 P.3d 2 (2017), the Arizona Supreme Court addressed this very situation and concluded the witness's testimony was admissible as being "nontestimonial" in nature and thus "not subject to the strictures of the Confrontation Clause." *Id.* at 15. The Arizona court further stated that "a medical examiner may offer an opinion based on the autopsy performed by a non-testifying expert without violating the Confrontation Clause so long as the examiner testifies as to his or her own conclusions, is subject to cross-examination, and the report is not to be admitted into evidence." *Id.* "Expert testimony that discusses reports and opinions of another is admissible . . . if the expert reasonably relied on these matters in reaching his own conclusion." *Id.*, quoting *State v. Smith*, 215 Ariz. 221, 159 P.3d 531, 538 (2007).

We conclude the reasoning of the Arizona Supreme Court on this issue is sound and may be applied by the trial court in this case should the issue arise again. *See also, e.g., Smith v. State*, 898 So.2d 907 (Ala. Crim. App. 2004); *Ackerman v. State*, 51 N.E.3d 171 (Ind. 2016); *State v. Lackey*, 120 P.3d 332 (Kan. 2005)[11]; *Rollins v. State*, 161 Md.App. 34, 866 A.2d 926 (Md.Ct.Spec.App. 2005); *State v. Maxwell*, 9 N.E.3d 930 (Ohio 2014); and Kimberly J. Winbush, *Application of Crawford Confrontation Clause Rule to Autopsy Testimony and Related Documents*, 18 A.L.R.7th Art. 6 (originally published in 2017).

We conclude Dr. Ralston should be permitted to testify concerning the results of Dr. Belenky's autopsy report.

## F. Limits placed on cross-examination of Meleah Oldfield and Appellant's confrontation and due process rights by limiting inquiry into Oldfield's interactions with prosecutors

Meleah Oldfield was Conley's cell mate after her arrest and a Commonwealth's witness who testified against Conley at trial, apparently in return for leniency in the felony charges pending against her. At trial Oldfield testified concerning several incriminating statements Conley allegedly made to her, including that Conley said the reason she had killed her mother was because she and her mother had a disagreement concerning Conley's boyfriend. Oldfield stated Conley said her mother gave her an ultimatum—her or the boyfriend—and as a result Conley stabbed her mother to death. Oldfield

---

[11] Overruled on other grounds by *State v. Davis*, 283 Kan. 569 (Kan. 2006).

testified that when Conley told her this, there was no emotion; she was "soulless." Oldfield also testified that Conley was concerned she would not inherit anything from her mother because she had killed her.

In connection with the Oldfield testimony, Conley also sought to call Joseph Holbrook, former counsel for Oldfield, as an expert to testify that from his experience in criminal practice, the prosecutor's office, as a matter of policy, routinely declines to extend diversion recommendations to individuals facing a trafficking in controlled substance indictment, and their offer to Oldfield was a deviation from that policy based on her cooperation on Conley's case.

Conley contends the trial court erred by refusing to allow her to cross-examine Oldfield on the issue of Oldfield's meeting with prosecutor Hilton, which occurred prior to her talking to detectives.[12]

A defendant has a constitutional right to put in evidence any fact which might show bias on the part of a witness who has testified against him. *Crane v. Kentucky*, 476 U.S. 683 (1986); *Davis v. Alaska*, 415 U.S. 398, 313 (1974);

---

[12] Conley also mentions in her brief that she had objected at trial to the trial court's denial of her efforts to cross-examine Oldfield concerning (1) the facts of Oldfield's underlying charge of trafficking versus what she told the court at her final sentencing to prove that she had lied under oath; (2) her jail phone calls in which she offered to prostitute herself out in exchange for bond money; and (3) the bail jumping charge when she did not return to court after she bonded out, as well as a second-degree burglary charge in Ohio when she was released on bond on the trafficking charge. Conley does not specifically argue on appeal, however, that these rulings were incorrect, provide additional detail concerning the underlying facts of these areas, or provide supporting arguments or citations related to these areas. Our rules require litigants to provide this Court with "citations of authority pertinent to each issue of law." CR 76.12(4)(c)(v). Conley provides no citation to authority concerning these issues. Accordingly, we decline to address them.

*Pointer v. Texas,* 380 U.S. 400, 406 (1965); *Adcock v. Commonwealth,* 702 S.W.2d 440, 441 (Ky. 1986). Similarly, KRE 611(b) states that "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility." Kentucky's rule on cross-examination is "wide open." *DeRossett v. Commonwealth,* 867 S.W.2d 195, 198 (Ky. 1993). However, the scope of wide-open cross examination is subject to the reasonable discretion of the court. KRE 611(a)(b); *Moore v. Commonwealth,* 771 S.W.2d 34, 38 (Ky. 1988).

Upon application of the above principles, upon retrial Conley should be entitled to cross-examine Oldfield concerning her meetings with representatives of the prosecution and any discussion between them relating to Oldfield's testimony against Conley in this case and any benefits Oldfield would receive in return for that testimony. See *Davis v. Alaska, supra.*

## IV. CONCLUSION

For the reasons stated above, the judgment of the Kenton Circuit Court is vacated, and the case is remanded for a new trial consistent with this opinion.

All sitting. Minton, C.J.; Hughes, Keller, Lambert and VanMeter, JJ., concur. Wright, J., concurs in part and dissents in part by separate opinion.

WRIGHT, J., CONCURRING IN PART AND DISSENTING IN PART: While I concur with the remainder of Justice Buckingham's well-written opinion and agree with the disposition, I dissent as to the directive to the trial court that testimony regarding the Clue game would be admissible upon retrial. This testimony is irrelevant to any issues adduced at trial. Furthermore, even if it

41

passed the relevance hurdle, the testimony—which described Conley laughing about her mother's death—is inadmissible under the *Bell* test, KRE 403, and KRE 404(b). The probative value of such testimony is substantially outweighed by the danger it would unduly inflame the jury.

COUNSEL FOR APPELLANT:

Emily Holt Rhorer
Assistant Public Advocate, Department of Public Advocacy

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Thomas Allen Van De Rostyne
Assistant Attorney General

# Supreme Court of Kentucky

2017-SC-000291-MR

LARA PAIGE CONLEY                                                    APPELLANT

V.
ON APPEAL FROM KENTON CIRCUIT COURT
HONORABLE KATHY KAOEM JUDGE
NO. 2015-CR-00278

COMMONWEALTH OF KENTUCKY                                             APPELLEE

## ORDER

The Opinion of the Court rendered June 13, 2019, is corrected on its face by

substitution of the attached opinion in lieu of the original opinion.  Said correction does

not affect the holding of the original Opinion of the Court.

ENTERED: July ___25___, 2019.

_____
CHIEF JUSTICE